**In the Matter of NEWBERRY SQUARE, INC., Debtor.**

**Bankruptcy No. 94–50795–S.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Dec. 1, 1994.

Andrew S. Conway, Stephanie M. Zimmerman, Miro, Miro & Weiner, Bloomfield Hills, MI, for debtor.

Michael S. Khoury, Michael I. Conlon, Clark, Klein & Beaumont, Detroit, MI, David R. Kuney, Jeffrey L. Tarkenton, David & Hagner, Washington, DC, for RTC.

### AMENDED SUPPLEMENT TO BENCH OPINION OF NOVEMBER 2, 1994 RELATING TO ASSIGNED RENTS AS PROPERTY OF THE ESTATE

WALTER SHAPERO, Bankruptcy Judge.

This Opinion supplements the bench opinion of November 2, 1994.[1] At that time, the Court orally ruled that assigned rents arising from the operation of Debtor's shopping center are property of the Debtor subject to the Code's constraints on the use of cash collateral pursuant to § 363. Because this is a

---

1. The November 2, 1994 hearing was a preliminary hearing on Debtor's Emergency Motion for Use of Cash Collateral and the secured party's ("RTC") Motion to Sequester, Turn Over and Prohibit the Use of Rents.

significant legal question and because the bench opinion addressed the issue in an abbreviated form, this Court is issuing this written Opinion to clearly indicate its views on this recurring matter.

The salient and basically undisputed facts are as follows:

(a) Debtor is the owner of a neighborhood shopping center comprised of an anchor tenant and a number of retail and service tenants.

(b) On or about October 10, 1990, Debtor executed a promissory note (in the original amount of $10,700,00), mortgage, security agreement and financing statement, and an assignment of rents ("Assignment") together with other loan documents contemplating the construction and completion of the shopping center.

(c) The original note due date was May 1, 1992 (though at the oral argument it was indicated that date was extended to a date near the end of 1993).

(d) RTC became the successor to the original mortgage pursuant to a series of mesne assignments.

(e) Prior to its bankruptcy filing, Debtor was in default; RTC, in accordance with the Assignment and the applicable statute (Mich.Comp.Laws Ann. § 554.232; Mich.Stat.Ann. § 26.1137(2)) notified by letter dated October 24, 1994 the various shopping center tenants of the Debtor's default and demanded they pay their rentals to the RTC ("Notice").

■ RTC relies primarily on the holding of *In re Mount Pleasant Ltd. Partnership*, 144 B.R. 727 (Bankr.W.D.Mich.1992), a case which is factually analogous to this case. Specifically, RTC argues that its service of the Notice pursuant to its perfected Assignment legally terminated all of Debtor's interest in the rents such that the rents should no longer be considered "property" of the Debtor under § 541(a) and, therefore, not subject to any possible cash collateral order. The Debtor, on the other hand, disagrees with the result reached in the *Mount Pleasant* case and, instead, emphasizes the language of the bankruptcy statute and cases which come to the opposite conclusion in similar factual contexts.

This Court concludes (with due respect for Judge Stevenson, its author) that the result in *Mount Pleasant* was incorrect. Instead, the proper rationale and analysis of the issue is set forth in such cases as: *In re Willows of Coventry, Ltd. Partnership*, 154 B.R. 959 (Bankr.N.D.Ind.1993); *In re Mews Associates L.P.*, 144 B.R. 867 (Bankr.W.D.Mo. 1992); *In re Bethesda Air Rights Ltd. Partnership*, 117 B.R. 202 (Bankr.D.Md.1990); and *In re Atrium Dev. Co.*, 159 B.R. 464 (Bankr.E.D.Va.1993). The basic conclusion from those cases, as expressed in *Atrium Dev.*, is:

> the debtors' interests in the rents, which constituted cash collateral, can be extinguished only by a foreclosure of the rent producing collateral pursuant to state law.

*Atrium Dev.*, 159 B.R. at 470. The reasons indicated below (not necessarily discussed in the order of importance) support this Court's findings.

■ First, this Court finds that the language of the Code supports a finding that the assigned rents are property of the Debtor. Statutory language set forth in §§ 363(a), 541, 552(b), and 363(c)(2)(B) contemplates rents (even those which are the subject of perfected rent assignments) as property of the estate. For example: section 541 by its terms includes rents from property of the estate, as property of the estate; section 363 defines "cash collateral" as including rents of the property subject to a security interest as provided in § 552(b); and section 552(b) states that a security interest in rents, acquired before the case filing, extends to such after the filing to the extent provided by the security agreement and allowable pursuant to applicable nonbankruptcy law. This Court interprets the statutory requirement to notify tenants of the assignment of rents an enforcement mechanism for collecting rents and not the final "perfection" step. Viewed in that light, this case is really no different than those cases where the tenant notification did not take place pre-petition, and perfection is deemed to have occurred pre-petition when the assignment was originally re-

corded. In *Coventry Commons*, the District Court of the Eastern District of Michigan opined:

> As Travelers has a perfected present security interest in the rents, such rents must be treated as cash collateral as required under 11 U.S.C. §§ 363(a) and 552(b). The rents are cash collateral because both the bankruptcy estate and Travelers have an interest in the rents and the rents are subject to a security agreement as provided by § 552(b). *See In re Bethesda Air Rights Ltd. Partnership*, 117 B.R. 202, 209–10 (Bankr.D.Md.1990) (where rents are treated as security, rents collected post-petition are cash collateral, even where creditor had perfected its interest in the rents pre-petition and had satisfied state law requirements to enforce assignment of rents).

*In re Coventry Commons Associates*, 143 B.R. 837, 839 (E.D.Mich.1992). To summarize, the statutory language itself captures rents, that are the subject of a perfected security interest or assignment, as property of the estate.

Second, it is clear from the Assignment document itself that it was intended for security although the Assignment's scrivener was careful not to state on its face that the Assignment was for security (and in fact used language like "absolutely and unconditionally assigns", etc.). It is evident from the document itself and the context of its execution and delivery that the Assignment:

(a) was "part of the consideration of the indebtedness evidenced by the Note and Mortgage";

(b) was "intended" to be an assignment of rents pursuant to Mich.Comp.Laws Ann. § 554.231, *et. seq.;*

(c) was part and parcel of an all comprehensive construction loan/mortgage transaction incident to the development of, and initial short term intermediate financing for, the shopping center;

(d) obviated the necessity of either having a receiver appointed or having the mortgagee obtain possession, in order to collect those rents;

(e) mandated upon default that the RTC use and apply the rents to the costs of managing the property, costs of repair, payment of insurance premiums, taxes, etc.; and

(f) terminated upon discharge of the mortgage.

*See also Smith v. Mutual Benefit Ins. Co.,* 362 Mich. 114, 106 N.W.2d 515 (1960); Baum, *Bankruptcy v. Assignment of Rents: A Case to be Decided,* Michigan Real Property Review, Spring 1992; *cf.* Moreno and Eisele, *Assignment of Rents in Michigan under Michigan Law,* Michigan Real Property Review, Winter 1992, p. 137.

Third, the Debtor retains a substantial interest in those rents and the ongoing stream of income represented thereby because those rents, even in the hands of the mortgagee, must, by law or by the terms of the assignment itself, be applied to the costs of maintaining the property, with any surplus applied to the debt.[2] The assignment of rent statute and the assignment executed and recorded pursuant thereto are nothing more, or less, than a way of giving a realty mortgagee control over rents during the period when foreclosure laws preclude the mortgagee from obtaining possession. However, the receipt and use of those rents are necessarily tied to and controlled by the realty foreclosure procedure, and by reason thereof, the property interest therein of a Chapter 11 reorganizing debtor is substantially the same as that debtor's interest in the realty itself. Were it not for the statute (or the appointment of a receiver), the foreclosing mortgagee would have to wait until the expiration of the equity of redemption to obtain the rents (and possession). In essence, the assignment of rents gives the mortgagee nothing more

---

**2.** One might wonder why the parties are fighting given that whether or not the rents are deemed property of the estate might not materially affect the use of those rents in this case. If the rents are held *not* to be property of the estate, the law nevertheless requires that they be applied to the costs of maintaining the property and any excess to reducing the debt; if the rents are held to be property of the estate, adequate protection would likely require at least a somewhat similar result. Aside from the question of initial control of the funds, the significant issue becomes the availability of all or part of the excess for reorganization purposes.

with respect to the rents than it has with respect to the realty itself. To conclude otherwise would carry the purpose and meaning of the Assignment of Rents statute far beyond its primary intent (i.e. to enable a mortgagor to obtain rents as additional security) and give such assignments an unintended independence from the realty or the leases from which they emanate.

Fourth, Debtor's leases are themselves property rights. They are likely executory contracts and thus subject to debtor's right and/or duty to assume or reject within the statutory period pursuant to § 365(d)(2) and (4). It is difficult to square RTC's theory that the rents owed under the leases, whether present or future, irrevocably and unconditionally belong to RTC, with the Debtor's apparent right to assume the very leases under which those rents are to be paid. The right to assume a lease logically includes the right to receive the rentals payable under that lease, subject to whatever restraints the Code imposes on their use. The right to assume a lease would be a hollow one, indeed, if the rents payable under it by dint of an assignment were considered forever unavailable to the assuming reorganizing debtor/lessor.

Fifth, in an ongoing Chapter 11 reorganization proceeding, assigned rents are akin to accounts receivable subject to a pre-petition security agreement. Under the Code, the accounts receivable and their proceeds are property of the estate, notwithstanding their use as collateral or the fact that the account debtors may have been notified pre-petition to pay the amounts owed Debtor to the secured party. The notification requirement for collecting the accounts receivable amounts to nothing more than the statutory notification requirement provided for in the assignment of rents statute. Because accounts receivable are estate property and because this Court believes that there is no logical or conceptual difference between the assigned rents and accounts receivable, the assigned rents likewise ought to be considered estate property.

The final basis for this Court's conclusion is found in an analysis of the Supreme Court's decision in *U.S. v. Whiting Pools,*

*Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). The *Whiting* Court found that property seized pre-petition by the IRS to satisfy a pre-petition tax lien was nevertheless property of the estate in the context of a Chapter 11 reorganization. The bankruptcy court in *Willows of Conventry* summarized the holding in *Whiting Pools* as follows:

> In *Whiting Pools* the Supreme Court was called upon to decide whether a Chapter 11 debtor could compel the turnover, pursuant to 11 U.S.C. § 542, of property that had been seized by a secured creditor prior to the petition. In answering the question, the Court readily determined that the property in question constituted property of the estate, notwithstanding the pre-petition seizure. *Whiting Pools,* 462 U.S. at 202–09, 103 S.Ct. at 2312–15. In concluding that the turnover order was properly granted the Court stated:
>
>> As does all bankruptcy law, § 542(a) modifies the procedural rights available to creditors to protect and satisfy their liens ... In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement or reorganization proceedings. The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession. *Whiting Pools,* 462 U.S. at 207, 103 S.Ct. at 2314–15 (citations omitted).
>
> The Court then concluded:
>
>> Section 542(a) simply requires the [creditor] to seek protection of its interest according to the congressionally established bankruptcy procedures, rather than by withholding the seized property from debtor's efforts to reorganize. *Whiting Pools,* 462 U.S. at 212, 103 S.Ct. at 2317.

*Willows of Conventry,* 154 B.R. at 965. The Court in *Willows* applied the same principles to an assignment of rents which was intended only as a security device. Therefore, this same reasoning applies to the instant case.

The Court in *Whiting Pools* did state that if the tax levy or seizure transfers "ownership" of the seized property, § 542(a) "may"

not apply. However, the Court then went on to note that:

(a) the Internal Revenue Code's levy and seizure provisions were "special procedural devices available to the IRS to protect and satisfy its liens", and as such were "analogous to the remedies available to private secured creditors" under the UCC; and

(b) such remedies were provisional and "merely bring the property into the Service's legal custody"; and

(c) "at no point does the Service's interest in the property exceed the value of the lien"; and

(d) the IRS was "obligated to return to the debtor any surplus from a sale."

*Whiting Pools,* 462 U.S. at 210–11, 103 S.Ct. at 2317. Thus the *Whiting* court emphasized the very attributes of the government tax lien that the court in *Mount Pleasant* explained away as not relevant with respect to an assignment of rents.[3] Therefore, this Court concludes that the analysis in *Mount Pleasant* failed to give sufficient weight to the overlay that the Bankruptcy Code (as viewed in *Whiting Pools* ) brings to the reorganization process. When the Supreme Court opines that adequate protection rights are designed to "replace protection afforded by possession," the only logical conclusion is that the "possession" referred to is analogous to the nature and extent of the property interest the assignee has under the assignment of rents (as opposed to indefeasible and lasting ownership free and clear of any possible rights of the Debtor/mortgagor). The assigned rents have no different status for these purposes then the real estate itself. In this Court's view, any difference between dollars received by a mortgagee from an assignment of rents from a debtor/mortgagor who remains in possession of the property that produces those rents, on one hand, and tangible personalty (or accounts receivable) seized pre-petition by a lien holder having a pre-petition security interest in that personalty, on the other, is an insufficient basis

upon which to conclude that the concepts enunciated in *Whiting Pools* are not applicable here.

RTC's position, that assigned rents are not property of the estate, has adverse ramifications to the bankruptcy reorganization process. If assigned rents are not property of the estate, then it is unlikely that a reorganization would be possible in a situation where the sole source of income of a single asset Chapter 11 debtor emanates from assigned rents.

RTC cites the recent case of *Otis Elevator Company v. Mid American Realty and Newark Fireman's Insurance Company,* 206 Mich.App. 710, 522 N.W.2d 732 (1994) in support of its position. In *Otis,* the Otis Elevator Company ("Otis") became a judgment creditor of a mortgagor sometime after the mortgage and an assignment of rents incident thereto had been recorded, a default had occurred in the mortgage, and a notice of the default was recorded, but before the tenants had been served with the statutory notice. Pursuant to its judgment, Otis garnisheed the tenants of the mortgagor seeking to obtain the rents to apply to its judgment, the garnishments having been served before the notice of the default had been served on the tenants. The Court of Appeals affirmed the trial court's dissolution of the garnishments concluding:

> Otis could not garnish Mid–America's interest in the rents because Mid–America no longer had a valid property interest in the rents subsequent to its default on its mortgage with Fireman's.

While that language is somewhat troublesome, that decision should not be seen as requiring a different result for this case for the following reasons:

(1) the situation in *Otis* concerned a determination of the relative priority rights of two creditors of the mortgagee, and did not determine the rights as between the mortgagor and mortgagee; in that context, the Court of Appeals

---

**3.** In 1 Epstein, et al., *Bankruptcy* § 2–8 at 40 (West 1992), the authors, in analyzing *Whiting Pools,* stated:

It seems clear from dicta in Whiting Pools that the Court would reach a similar result if a private creditor seized property subject to its security interest.

was probably right at least in the result that it reached;

(2) it was unnecessary for the state court to draw any conclusions as to what rights, if any, the mortgagor retained when deciding the priorities as between the two creditors; the determination of the mortgagor's rights was only necessary for determining that, whatever those rights were, they were both subject to the assignment of rents and were garnishable—the real and only question being the relative priorities between the rent assignee and the garnisheeing creditor; and

(3) while bankruptcy courts do look to state law when determining what constitutes "property" under § 547, the requirement that bankruptcy courts look to state law when defining "property" is tempered by the presence of controlling federal law; if federal law, such as where the statutory language of the Code, indicates a broader policy or construction than what state law might otherwise indicate, the question of what is "property" of the estate thus ultimately becomes one of federal law. *See Barnhill v. Johnson* [—— U.S. ——], 112 S.Ct. 1386 [118 L.Ed.2d 39] (1992); *Board of Trade of Chicago v. Johnson*, 264 U.S. 1 [44 S.Ct. 232, 68 L.Ed. 533] (1924). In this Court's view the provisions of the Code cited and analyzed by this Court constitute controlling federal law on the subject.

■ *Otis* is worth noting, however, in that it essentially affirms this Court's view that it is the original recording of the assignment followed by the default of the mortgagor that matures the mortgagee's rights in the rents, not the notice to tenants provision in the Assignment of Rents Statute.

In light of the foregoing discussion and seen properly in the context of the Michigan statute this Court finds that:

(i) once default occurs, the required act of service on the tenants only determines whether the mortgagor or the mortgagee has the ongoing right to actually receive the rents; service is primarily a protection for the tenant,

not an act or event designed to alter or determine the nature of the basic relationship between mortgagor and mortgagee;

(ii) RTC's interest in the rents it obtained the right to collect was a security interest; its interest was not an absolute one or one which, by definition, excluded the existence therein of any rights of the Debtor/mortgagor;

(iii) as RTC's interest is a security interest, the Debtor retains an equitable interest in the rents (and/or the leases involved) which by definition makes them property of the estate.

■ During the oral argument on this matter, the Court wondered aloud as to whether any provisions of the Bankruptcy Reform Act of 1994 which was signed into law on October 22, 1994, (five days before the filing of this Case) impacted on the issue before the Court. Section 214 of that Act is the only potentially applicable provision, amending, as it does, §§ 552(b) and 363(a). The primary purpose of those amendments, insofar as might be relevant to this case, was to provide lenders with valid·security interests in post-petition rents notwithstanding their failure to have fully perfected those interests under state law. Since perfection was clearly accomplished pre-petition in this case, the new law does not impact this decision.

Debtor shall present an appropriate order.